**COHN LIFLAND PEARLMAN**
 **HERRMANN & KNOPF LLP**
PETER S. PEARLMAN
Park 80 West - Plaza One
250 Pehle Avenue - Suite 401
Saddle Brook, NJ  07663
Tel.:  (201) 845-9600
psp@njlawfirm.com
*Attorneys for Plaintiff*
*[Additional Counsel listed on signature page.]*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRIAN BAAR, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>   v.<br><br><br>JAGUAR LAND ROVER NORTH AMERICA, LLC and JAGUAR LAND ROVER LIMITED,<br><br>            Defendants. | **<u>CLASS ACTION COMPLAINT</u>**<br><br><br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Brian Baar ("Plaintiff"), residing at 1892 Chalcedony St., San Diego, California, individually and on behalf of a class of all those similarly situated, brings this class action for treble damages and injunctive relief against Jaguar Land Rover North America, LLC ("JLR") and Jaguar Land Rover Limited (collectively, "Defendants") for violations of the Sherman Antitrust Act ("Sherman Act"), the Clayton Antitrust Act ("Clayton Act") and the laws of the several states identified herein. Based on counsel's investigation, research and review of publicly available documents, on Plaintiff's personal knowledge, and upon information and belief, Plaintiff alleges as follows:

## INTRODUCTION

1.      This is an antitrust, state competition law and unjust enrichment class action against Defendants arising out of the implementation and enforcement of an unlawful anticompetitive agreement, which prohibits purchasers ("Purchasers") of new JLR motor vehicles ("JLR Vehicles") from exporting their JLR Vehicles outside of the United States for resale for up to one year from the date of delivery (the "JLR No-Export Policy").

2.      Under the JLR No-Export Policy, Purchasers are required to sign No-Export Agreements, which are virtually identical among JLR's authorized U.S. dealers ("Dealers"). One Dealer's No-Export Agreement provides:

> [DEALER] as a Jaguar Land Rover North America authorized, franchised dealer, is subject to the anti-export and broker policy of Jaguar Land Rover North America. Jaguar Land Rover North America prohibits its authorized dealers from exporting or agreeing to export Jaguar Land Rover vehicles outside of the Jaguar Land Rover North America authorized sales territory, which includes the United States. Jaguar Land Rover North America prohibits its authorized dealers from selling vehicles to individuals, entities or other vehicle dealer, with intent to resell or broker vehicles. An individual, entity or other vehicle dealer, who purchases vehicles with the intent to resell or export for resale (regardless of whether the vehicle is titled or registered), will be considered a broker and the transaction brokered. In the event Jaguar Land Rover North America determines that a Jaguar Land Rover vehicle

sold or leased by a Jaguar Land Rover North America authorized dealer has been exported from its sales territory or brokered to another individual, entity or dealer, Jaguar Land Rover North America may assess charges, penalties and other related costs against the selling dealer.  [DEALER], therefore, requires each purchaser or lessee of a new Land Rover vehicle to acknowledge and agree in writing that the vehicle being purchased/leased is intended for use within the United States and is not intended for export outside the United States and is not intended for resale. Accordingly, by your signature below, you the purchaser/lessee acknowledge and represent that the Land Rover vehicle being purchased/leased by you is not intended for export or resale and is intended for use within the United States.

3.      The No-Export Agreement also requires a Purchaser to attest that (i) the Purchaser has no intention of exporting the JLR Vehicle outside the United States for up to one year from the date of delivery; (ii) if the JLR Vehicle is exported (even by subsequent purchasers), the Purchaser is subject to liquidated damages ranging from $25,000 to $40,000, losses and expenses; and (iii) the JLR Vehicle warranty will be voided.

4.      Beginning as early as April 2013, Defendants implemented and enforced the JLR No-Export Policy.  Dealers agreed to comply with and enforce the JLR No-Export Policy.

5.      Defendants were motived to implement and enforce the unlawful anticompetitive JLR No-Export Policy in light of high demand for luxury vehicles in certain foreign countries, including China.  In these countries, the price of certain luxury vehicles can be three to four times higher than the sale price of the same vehicles in the United States. This price differential creates an arbitrage opportunity for individuals or entities who wish to purchase luxury vehicles in the United States and export them to foreign markets for profit.  In late 2014 and early 2015, China eased restrictions on automobile imports, making the export of luxury vehicles from the United States more attractive.

6.      There is nothing unlawful about exporting motor vehicles that are purchased in this country.  Notwithstanding the legality of this conduct, Defendants sought to curb individuals and entities in the United States from exporting JLR Vehicles abroad for resale.

7.      Through implementation of the JLR No-Export Policy, Defendants sought to zealously protect their and their corporate affiliates' ability to sell JLR Vehicles in foreign markets, like China, at substantially higher prices than are charged for the same JLR Vehicles in the United States.

8.      The JLR No-Export Policy is multi-faceted.  First, JLR prohibits its Dealers from selling JLR Vehicles to Purchasers who intend to broker or resell the JLR Vehicles for export.  In accordance with this prohibition, Dealers routinely conduct extensive and intrusive due diligence checks on prospective customers to determine whether a JLR Vehicle is likely to be exported. Dealers conduct such background checks and "profile" individuals, even if the transaction is all cash.

9.      Dealers look for "red flags" identified by JLR in the JLR No-Export Policy, such as whether a Purchaser did not negotiate the price, paid with a cashier's check, or had the JLR Vehicle trucked-off the lot rather than driving it away.

10.     Dealers are required to maintain proof of their due diligence efforts in the deal jacket for each JLR Vehicle transaction.

11.     Dealers are also required to identify and report purchasers whom they believe to be exporting JLR Vehicles.  Dealers are required to maintain and frequently update a list of expected exporters, commonly referred to in the industry as a "blacklist."  In performing their due diligence,

Dealers are required to compare a prospective customer's name and address against JLR's "blacklist" or "known exporter list," among other databases.

12.     Under the JLR No-Export Policy, Dealers are subject to penalties in the form of chargebacks, reduction in inventory on popular models and even potential termination if too many of the JLR Vehicles they sell are exported.  In addition to the financial penalties imposed by JLR, the JLR No-Export Policy prohibits Dealers from freely selling their inventory, thereby reducing their overall sales.

13.     Under the JLR No-Export Policy, Purchasers are required to sign a No-Export Agreement when they purchase or lease a JLR Vehicle.

14.     A JLR representative publicly stated that the JLR No-Export Policy resulted in a two-thirds reduction in exports of JLR Vehicles from the United States.

15.     Through the JLR No-Export Policy, Defendants seek to restrict Purchasers, including U.S. consumers and exporters, from re-selling their JLR Vehicles abroad to protect the high prices that Defendants and/or their foreign affiliates charge outside of the United States.

16.     The JLR No-Export Policy constitutes a contract, combination or conspiracy to prevent JLR Vehicles purchased in the United States from being exported.

17.     As a direct and proximate result of the JLR No-Export Policy, U.S. commerce has been harmed and continues to be harmed by eliminating a channel of JLR Vehicle distribution, eliminating an arbitrage opportunity for Purchasers, and restricting the export market for re-sale of JLR Vehicles.

## JURISDICTION AND VENUE

18.     This Complaint is filed and these proceedings are instituted under Sherman Act Section 1, Sections  4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief under federal antitrust laws and to recover treble damages and the cost of suit, including reasonable attorneys' fees under state antitrust and consumer protection laws and restitution under common law, against Defendants for the injuries Plaintiff and members of the Class (defined below) sustained as a result of Defendants' misconduct.

19.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1337, and by the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

20.     The interstate commerce described in this Complaint is carried on, in part, within this judicial district. Venue is proper in this district pursuant to the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1367 and 1332.

21.     Venue is also proper because at least one Defendant is headquartered in this judicial district and Defendants operate and transact business within the district, have substantial contacts with this district, and engaged in an illegal anticompetitive conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this district.

## PARTIES

**A.  Plaintiff**

22.     Plaintiff Brian Baar is a California resident. Plaintiff Baar purchased a 2015 Range Rover HSE on April 1, 2015 from Hoehn JLR, Inc. in Carlsbad, California. Plaintiff was subject to and required to sign the No-Export Agreement in connection with this purchase.  The No-Export

Agreement which Plaintiff signed subjected him to a monetary fine or penalty if the JLR Vehicle he purchased was exported within one year of delivery.  Plaintiff would have re-sold the JLR Vehicle for export within one year of delivery absent the No-Export Agreement.  Plaintiff was injured as a direct and proximate result of the No-Export Agreement.  But for the No-Export Agreement, Plaintiff would continue to lease or purchase and resell JLR Vehicles within one year of delivery for export.  If the JLR No-Export Policy, including the No-Export Agreement, is declared unlawful and its terms unenforceable, Plaintiff intends to purchase JLR Vehicles for resale within one year of delivery for export.

### B.  Defendants

23.      Defendant Jaguar Land Rover North America, LLC ("JLR") is a company organized under the laws of Delaware with its principal executive offices at 555 MacArthur Boulevard, Mahwah, New Jersey, United States.  Defendant JLR is a U.S. distributor of luxury cars and sport utility vehicles bearing the Jaguar and Land Rover (including Range Rover) marques.  JLR is a wholly-owned subsidiary of Defendant Jaguar Land Rover Limited ("JLR UK") and the entity through and with which JLR UK implements the JLR No-Export Policy.  JLR's intermediary parent company is Jaguar Land Rover Automotive plc.  Jaguar Land Rover Automotive plc operates within different territories or countries through related companies.  Jaguar Land Rover Automotive plc is a subsidiary of Indian automaker Tata Motors Ltd.

24.      Defendant JLR UK is a company organized under the laws of England and Wales with its principal executive offices located at Abbey Road, Whitley, Coventry, CV3 4LF, United Kingdom.  JLR UK designs, develops, manufactures and sells JLR Vehicles in the United States and abroad.

## CO-CONSPIRATORS

25.     Various other persons, firms and entities not named as defendants herein have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

## FACTS

### A.  The JLR Vehicle Distribution System

26.     JLR UK manufactures JLR Vehicles in the United Kingdom.  JLR UK sells JLR Vehicles in different countries, at various prices, through authorized distributors in specific territories.  Land Rover vehicles are exported to 169 countries and Jaguar vehicles are exported to 63 countries.

27.     JLR is the sole distributor of JLR Vehicles in the United States and Canada pursuant to an arrangement with JLR UK.  Upon information and belief, JLR's allocation of vehicles from JLR UK may be reduced due to the volume of JLR Vehicles that are exported from the United States.

28.     In accordance with the arrangement between JLR and JLR UK, JLR establishes territories and grants exclusive franchises to Dealers through Automobile Dealer Sales and Service Agreements.  The purpose of such agreement is fourfold: (i) to allow the Dealer to represent itself as an authorized JLR Dealer; (ii) to impose rights and operating obligations; (iii) to affirm an expectation between the parties that each will perform its obligations in accordance with the rules of JLR; and (iv) to create a distribution network among Dealers under unitary rules of operation for all Dealers.

### B.  The JLR No-Export Policy

7

29.     Demand for luxury motor vehicles in certain foreign countries, including China and Russia, has soared.  The Chinese car market is the largest passenger car market in the world.

30.     In foreign countries, such as China, certain vehicles sell for approximately three times the price as in the United States.  As a result, there is an arbitrage opportunity for U.S. Purchasers, who can obtain up to approximately $40,000 for shipping a vehicle to China for resale.

31.     Recognizing the financial impact to its foreign sales resulting from U.S.-exported JLR Vehicles, Defendants and their co-conspirators implemented the JLR No-Export Policy through a series of steps in violation of the federal and state antitrust laws to prevent JLR Vehicles purchased in the United States from being exported for resale.

32.     First, the JLR No-Export Policy prohibits Dealers from selling JLR Vehicles to Purchasers who intend to broker or resell those vehicles for export.

33.     Second, the JLR No-Export Policy requires Dealers to take certain steps to prevent Purchasers from subsequently exporting their JLR Vehicles, including performing due diligence to determine if the Dealer should decline the sale and requiring Purchasers to sign No-Export Agreements.

34.     The JLR No-Export Policy requires each Dealer to conduct extensive due diligence on its customers, including those who intend to pay cash for a JLR Vehicle.  Dealers are required to thoroughly "profile" their customers to identify what JLR believes to be "red flags" that suggest the customer may be acquiring the JLR Vehicle for export.  If, as a result of this investigation, a Dealer believes a customer intends to resell the JLR Vehicle for export, the Dealer must refuse to sell the Vehicle to that customer.

35.     A "blacklist," also known as the "known exporter list" is electronically transmitted to Dealers in order to enforce the JLR No-Export Policy.  The "blacklist" is maintained and reviewed by Dealers at the direction of JLR.  Dealers refuse to sell JLR Vehicles to customers whose names appear on the "blacklist."

36.     JLR also requires Dealers to maintain accurate lists of all customers who purchase or lease their cars and to share that list with JLR.  Under the JLR No-Export Policy, Dealers should also review JLR's "prospect research tool," which allows Dealers to identify customers who recently purchased multiple JLR Vehicles at different Dealers.

37.     Dealers abide by the JLR No-Export Policy by maintaining proof of all due diligence efforts from a sale in the deal jacket.

38.     In accordance with the JLR No-Export Policy, Dealers also require all Purchasers of JLR Vehicles to confirm in writing, through No-Export Agreements, that they are not purchasing the JLR Vehicle for the purpose of exporting it or re-selling it to an exporter, broker, dealer, or wholesaler for export.

39.     The No-Export Agreements inform customers that if their JLR Vehicle is shipped overseas by them or someone else for up to one year of the date of delivery, they can be subject to an action for damages, losses and expenses, rescission of the sale, criminal liability for defrauding the dealership, loss of the warranty, and might be prohibited from purchasing a JLR Vehicle in the future.

40.     The No-Export Agreements, which are all virtually identical among Dealer, provide in pertinent part:

> [DEALER] as a Jaguar Land Rover North America authorized, franchised dealer, is subject to the anti-export and broker policy of Jaguar Land Rover North America.

Jaguar Land Rover North America prohibits its authorized dealers from exporting or agreeing to export Jaguar Land Rover vehicles outside of the Jaguar Land Rover North America authorized sales territory, which includes the United States. Jaguar Land Rover North America prohibits its authorized dealers from selling vehicles to individuals, entities or other vehicle dealer, with intent to resell or broker vehicles. An individual, entity or other vehicle dealer, who purchases vehicles with the intent to resell or export for resale (regardless of whether the vehicle is titled or registered), will be considered a broker and the transaction brokered.  In the event Jaguar Land Rover North America determines that a Jaguar Land Rover vehicle sold or leased by a Jaguar Land Rover North America authorized dealer has been exported from its sales territory or brokered to another individual, entity or dealer, Jaguar Land Rover North America may assess charges, penalties and other related costs against the selling dealer.  [DEALER], therefore, requires each purchaser or lessee of a new Land Rover vehicle to acknowledge and agree in writing that the vehicle being purchased/leased is intended for use within the United States and is not intended for export outside the United States and is not intended for resale. Accordingly, by your signature below, you the purchaser/lessee acknowledge and represent that the Land Rover vehicle being purchased/leased by you is not intended for export or resale and is intended for use within the United States.

41.    The No-Export Agreements also require all Purchasers to attest that:

- The JLR Vehicle is being purchased or leased for personal or business use in the United States and the Purchaser has no intention of exporting the JLR Vehicle outside the United States;

- The JLR Vehicle will not be exported outside the United States for up to one year from the date of delivery;

- If the JLR Vehicle is exported outside the United States within one year of delivery, the Purchaser shall be prohibited from future purchases/leasing and subject to liquidated damages of ranging from $25,000 to $40,000, losses and expenses as well as potential criminal liability; and

- The JLR Vehicle warranty will be voided under the Passport Services program if the JLR Vehicle is exported out of the United States.

42.    JLR forces Dealers to take required steps to comply with the JLR No-Export Policy by threatening to penalize them if JLR Vehicles sold by the Dealers are found to have been exported.  Dealers who sell a JLR Vehicle to persons who export the JLR Vehicle outside the United States are subject to fines, inventory allocation reductions, and/or termination of their dealership(s).

43.     JLR communicates its policies to dealers through "operations bulletins" on a regular basis.  Upon information and belief, JLR communicated the JLR No-Export Policy to Dealers by issuing approximately three operations bulletins between 2013 and present.  The operations bulletins were issued in or around April 2013, November 2014, and December 2015.

44.     The purpose and effect of the JLR No-Export Policy is to prevent Purchasers from taking advantage of an arbitrage opportunity that exists in foreign countries, such as China.  U.S Purchasers can obtain up to approximately $40,000 for shipping a JLR Vehicle to China for resale.

45.     At least one federal court recognized the anticompetitive motive behind export policies, such as the JLR No-Export Policy: "foreign luxury car manufacturers are clearly attempting to eliminate" Purchasers from "taking advantage of vehicle price differentials in foreign countries."  *United States of America v. Contents of Wells Fargo Bank Account XXX5826 in the name of Auto. Consultants of Hollywood, Inc.*, 13-cv-716, 2014 WL 12656914, at *8 (S.D. Ohio Apr. 1, 2014) (hereinafter, "*ACH*").

46.     JLR has acknowledged that some JLR Vehicles will slip through the cracks and be exported outside of the United States.  According to Stuart Schorr, JLR's Vice President of Communications and Public Affairs, JLR has expressly told Dealers that if more than 3% of their sales end up overseas they will be subject to fines, chargebacks, inventory reduction or termination.

47.     Notably, Mr. Schorr has stated publicly that the JLR No-Export Policy has resulted in a two-thirds reduction in exports of JLR Vehicles from the United States.

48.     The December 2015 operations bulletin further demonstrates the anticompetitive impact of the JLR No-Export Policy on the export market, stating: "[s]ince the implementation of

the November 24, 2014 Export and Broker Policy . . . [JLR] has seen a decrease of vehicles exported from the U.S."

49.     The December 2015 operations bulletin also stated that JLR was amending the policy "[i]n recognition of the retailer network's efforts in curbing vehicle exports."

50.     During a December 2015 interactive webinar between JLR and Dealers, JLR presented a graph showing a significant decrease in the percentage of exports.  The graph depicted decreases between 39% and 49% of certain Range Rover models that were exported within 6 months of sale from April 2013 to either May or October 2015.  This decline was the result of the Dealers' agreement to comply with the JLR No-Export Policy.

51.     There are no legitimate, pro-competitive justifications for the No-Export Policy.

52.     Any claimed pro-competitive justifications are mere pretexts for Defendants and their co-conspirators' unlawful anticompetitive agreement.

53.     At least one federal court recognized "that the primary concern" of luxury automobile companies, such as Defendants, in imposing no-export policies "is guarding their foreign market profits from competition from domestic automobile brokers." *ACH*, 13-cv-716, 2014 WL 12656914, at *6.

54.     In *ACH*, the Court rejected the U.S. government's suggestion that manufacturers sought to curb exports due to issues they may face in delivering recall notices to owners of exported cars and the fact that servicing exported vehicles may increase costs for a vehicle owner.  The Court stated that the latter would "be an issue for the vehicle owner and the parts seller to sort out." *Id.*

55.     The JLR No-Export Policy is not in the economic interest of the Dealers.  A Dealer in Cincinnati, Ohio (Rich Allen) told federal agents his dealership routinely receives--and is forced by the JLR No-Export Policy to refuse--one to three suspected exporter inquiries per week. According to Mr. Allen, he could sell his entire inventory in a matter of days if he did not screen for exporters.

### C.  Prior Allegations of an Antitrust Conspiracy to Prohibit Automobile Exports

56.     The automotive industry previously faced similar allegations of federal and state antitrust law violations through unlawful agreements to restrict the export of new vehicles from Canada to the United States.  *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 03-md-1532 (D. Maine) ("*Canadian Export*").

57.     Beginning in 2003, consumers brought a class action against U.S. and Canadian new motor vehicle manufacturers, distributors and dealer associations alleging that they conspired to restrict exports of lower priced vehicles from Canada into the United States.  The defendants entered into their alleged conspiracy to prevent downward pressure on the prices of new U.S. vehicles.  The class plaintiffs alleged that the defendants conspired to implement a series of requirements upon their dealers to foreclose the export distribution channel.

58.     The following evidence of conspiratorial conduct among the defendants was presented in *Canadian Export*:

> a.  Manufacturers discussed addendum agreements or clauses in sales agreements stating that consumers agreed not to export purchased vehicles (*i.e.*, No-Export Agreements);

b.  Automobile manufacturers met to discuss exchanging export data, best practices for curbing export sales, and sharing lists of known exporters;

c.  Following joint meetings, the automobile manufacturers ramped up their export restraints through enhanced due diligence checklists to dealers, harsher chargeback policies, dealer audits resulting in substantial chargebacks, developing online versions of known exporter blacklists, reducing vehicle allocations, and voiding warranties on exported vehicles;

d.  Subsequent to implementation of their enhanced export restraints, the automobile manufacturers continued to meet to share information on the measures that they were undertaking in order to prevent Canadian exports; and

e.  The manufacturers discussed how to mitigate exports to the United States and make exporting so difficult that it would be unattractive to exporters.

59.    Notably, in *Canadian Export*, the Court indicated in its summary judgement opinion that "there is probably enough evidence to reach a jury" on whether there was a conspiracy.

### D.  Unsuccessful Prosecutions in the Vehicle Export Market

60.    Exporting vehicles to most countries, including China, for resale is not unlawful. Indeed, the U.S. Government has conceded that this conduct is entirely lawful under U.S. export provisions, customs statutes, and the law. *See ACH*.

61.    In or around 2013, the U.S. government and the New York Attorney General began investigating automobile exporters who purchased luxury automobiles in the United States and

14

exported or intended to export those vehicles abroad for resale.  In accordance with those investigations, authorities seized vehicles and assets of suspected exporters.

62.    Following multiple unfavorable court decisions, which recognized the lawfulness of exporting vehicles for resale, the U.S. government released seized vehicles and funds. Thereafter, the government dropped proceedings and either slowed or halted investigations concerning purchases of vehicles for export.[1]

63.    For example, in January 2015, federal prosecutors in South Carolina agreed to return 57 luxury vehicles and nearly $380,000 to a Virginia-based exporter.

64.    In another case in South Carolina, a Porsche Cayenne and over $120,000 seized by U.S. authorities was returned to the owner and a civil forfeiture lawsuit was dropped.

## RELEVANT MARKET

65.    The relevant product market is the export market for JLR Vehicles.

66.    The relevant geographic market is the United States.

## INJURY AND THREATENED INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

67.    As a direct and proximate result of Defendants' misconduct, Plaintiff and members of the Class have been barred from or otherwise materially impaired in their ability to purchase JLR Vehicles free of the export restriction.  Consequently, Plaintiff and members of the class have been injured in their business and/or property by purchasing JLR Vehicles with restrictions that artificially depress the resale value of their JLR Vehicles and that prevent them from participating

---

[1] Matthew Goldstein, *Prosecutors Ease Crackdown on Buyers of China-Bound Luxury Cars*, THE NEW YORK TIMES (Apr. 1, 2015), https://www.nytimes.com/2015/04/02/business/dealbook/prosecutors-ease-crackdown-onbuyers-of-china-bound-luxury-cars.html.

in the export market.  Because the contract, combination and/or conspiracy is ongoing, Plaintiff and members of the Class are threatened with similar injury in the future.

## TRADE AND COMMERCE

68.     During the Class Period (defined below), Defendants and their co-conspirators distributed, sold, and/or leased JLR Vehicles in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, its territories, and the District of Columbia (collectively, the "United States").

69.     Throughout the Class Period, there was a continuous and uninterrupted flow of invoices and other documents essential to the sale and provision of JLR Vehicles transmitted interstate between and among the offices of Defendants and from Defendants to the Dealers throughout the United States.

70.     Throughout the Class Period, Defendants transported substantial amounts of JLR Vehicles in a continuous and uninterrupted flow of interstate commerce throughout the United States.

71.     Throughout the Class Period, Defendants' unlawful activities took place within and substantially affected the flow of interstate commerce and had a direct, substantial and reasonably foreseeable effect upon commerce in the United States.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action on his own behalf and as a class action under the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All persons and entities (excluding governmental entities, this Court, Defendants, their present and former parents, subsidiaries, affiliates, and co-conspirators) who

have been "blacklisted" or who signed a No-Export Agreement when indirectly purchasing a JLR Vehicle from Defendants through a Dealer in the United States from June 8, 2013 to present.

73.     With respect to the Third, Fourth and Fifth Claims for Relief, the Class seeks damages for those members of the Class who were harmed by Defendants' unlawful conduct in the United States asserted in those Claims for Relief.

74.     Plaintiff does not know the exact number of Class members, because such information is in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members are in the thousands throughout the United States, and in any event, are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

75.     Except as to the amount of damages each member of the Class has incurred, all other questions of law and fact are common to the Class, including, but not limited to:

     a.    Whether Defendants engaged in a contract, combination or conspiracy to prevent the export of JLR Vehicles from the United States;

     b.    The duration and extent of the contract, combination or conspiracy alleged in this Complaint;

     c.    Whether the alleged contract, combination or conspiracy violates Section 1 of the Sherman Act;

     d.    Whether the alleged contract, combination or conspiracy violates the antitrust or consumer protection laws of various states;

     e.    The appropriate measure of damages sustained by Plaintiff and other members of the Class;

f.     Whether, and to what extent, Defendants have been unjustly enriched as a result of its inequitable conduct; and

g.     Whether injunctive relief is an appropriate remedy.

76.    Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class.

77.    Plaintiff is typical and Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

78.    In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex antitrust class action litigation.

79.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

80.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages, and restitution.

81.    A class action is superior to other methods for the fair and efficient adjudication of this controversy.

82.    Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment also will permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this Complaint. This Class

action likely presents no difficulties in management that would preclude maintenance as a class action.

83.     The Class is readily ascertainable directly from the records of Defendants.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (For Declaratory Relief)

84.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though set forth herein.

85.     Defendants entered into a contract, combination or conspiracy to eliminate the export of JLR Vehicles from the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

86.     In furtherance of this contract, combination or conspiracy, Defendants required, and continue to require, Dealers to:

a.  Conduct "due diligence" investigations and "profile" prospective buyers to identify potential exporters and to refrain from selling JLR Vehicles to Purchasers identified as potential exporters;

b.  Review, create, maintain, and transmit to JLR and/or co-conspirators "blacklists" comprising the names of customers known or believed to be exporting JLR Vehicles;

c.  Refuse to sell JLR Vehicles to anyone who intends to export JLR Vehicles; and

d.  Utilize No-Export Agreements that prohibit Purchasers from exporting JLR Vehicles and impose substantial penalties in the event that a JLR Vehicle is exported.

87.     Defendants and/or their co-conspirators also took and are taking measures to enforce the contract, combination or conspiracy, including:

    a.   Threatening to penalize and penalizing Dealers that sell JLR Vehicles that are subsequently exported;

    b.   Threatening to withhold and withholding inventory of popular styles and colors of JLR Vehicles from Dealers that sell JLR Vehicles that are subsequently exported;

    c.   Threatening to terminate Dealers that had export incidents exceeding three percent of the Dealers' sales;

    d.   Threatening to terminate and terminating warranties for JLR Vehicles that were exported;

    e.   Refusing to provide owners of JLR Vehicles that are exported with warranty and recall information; and

    f.   Threatening, recommending and/or pursuing legal action against Purchasers who violate a No-Export Agreement or seeking to collect liquidated damages from Purchasers who violate a No-Export Agreement.

88.     These actions violate 15 U.S.C. § 1, *et seq.* and 15 U.S.C. § 26, *et seq.* in that they constitute a restraint of trade.

89.     An actual controversy exists between Plaintiff and the class on the one hand and Defendants on the other concerning the unlawful implementation and enforcement of the JLR No-Export Policy.

90.     Plaintiff and the Class are entitled to a declaration of the rights and obligations of the respective parties pursuant to 28 U.S.C. § 2201 *et seq.*  These violations are continuing and will continue unless enjoined by this Court.

91.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Class seek the issuance of a declaratory judgment that Defendants' course of conduct is unlawful as alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (For Injunctive Relief)

92.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though set forth herein.

93.     Defendants entered into a contract, combination or conspiracy with their co-conspirators to eliminate the export of JLR Vehicles from the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

94.     In furtherance of this contract, combination or conspiracy, Defendants required, and continue to require, Dealers to:

a. Conduct "due diligence" investigations and "profile" prospective buyers to identify potential exporters and to refrain from selling JLR Vehicles to Purchasers identified as potential exporters;

b. Review, create, maintain and transmit to JLR and/or their co-conspirators "blacklists" comprising the names of customers known or believed to be exporting vehicles;

c. Refuse to sell JLR Vehicles to anyone who intends to export JLR Vehicles; and

d. Utilize No-Export Agreements that prohibit Purchasers from exporting JLR Vehicles and impose substantial penalties in the event that a JLR Vehicle is exported.

21

95.     Defendants and/or their co-conspirators also took and are taking measures to enforce these agreements, including:

    a.  Threatening to penalize and penalizing Dealers that sell JLR Vehicles that are subsequently exported;

    b.  Threatening to withhold and withholding inventory of popular styles and colors of JLR Vehicles from Dealers that sell JLR Vehicles that are subsequently exported;

    c.  Threatening to terminate Dealers that had export incidents exceeding three percent of the Dealers' sales;

    d.  Threatening to terminate and terminating warranties for JLR Vehicles that were exported;

    e.  Refusing to provide owners of JLR Vehicles that are exported with warranty and recall information; and

    f.  Threatening, recommending and/or pursuing legal action against Purchasers who violate a No-Export Agreement or seeking to collect liquidated damages from Purchasers who violate a No-Export Agreement.

96.     These actions violate 15 U.S.C. § 1, *et seq.* and 15 U.S.C. § 26, *et seq.* in that they constitute a restraint of trade.

97.     These violations are continuing and will continue unless enjoined by this Court.

98.     Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff and the Class seek an injunction prohibiting Defendants and their co-conspirators' continued illegal course of conduct and adherence to the unlawful agreements alleged herein.

## THIRD CLAIM FOR RELIEF
### Violation of State Antitrust Statutes

99.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though set forth herein.

100.    Plaintiff seeks to enjoin Defendants from engaging in future anti-competitive practices and seeks damages as permitted under the antitrust laws of various states as set forth herein.

    a.  Defendants have violated Arizona Revised Stat. §§ 44-1401, *et seq.*

    b.  Defendants have violated Cal. Bus. & Prof. Code §§ 16700, *et seq.*

    c.  Defendants have violated D.C. Code Ann. §§ 28-4503, *et seq*.

    d.  Defendants have violated Iowa Code §§ 553, *et seq.*

    e.  Defendants have violated Kan. Stat. Ann. §§ 50-101, *et seq.*

    f.  Defendants have violated Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*

    g.  Defendants have violated Mich. Comp. Laws Ann. §§ 445.772, *et seq.*

    h.  Defendants have violated Minn. Stat. §§ 325D.51, *et seq.*

    i.  Defendants have violated Miss. Code. Ann. §§ 75-21-1, *et seq.*

    j.  Defendants have violated Neb. Rev. Stat. Ann. §§ 59-801.

    k.  Defendants have violated Nev. Rev. Stat. Ann §§ 598A, *et seq.*

    l.  Defendants have violated N.M. Stat. Ann. §§ 57-1-1, *et seq.*

    m.  Defendants have violated N.Y. Gen. Bus. Law §§ 340, *et seq.*

    n.  Defendants have violated N.C. Gen. Stat. §§ 75-1, *et seq.*

o.   Defendants have violated N.D. Cent. Code §§ 51-08.1-02, *et seq.*

p.   Defendants have violated R.I. Gen. Laws §§ 6-36-1, *et seq.*

q.   Defendants have violated S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*

r.   Defendants have violated Tenn. Code Ann. §§ 47-25-101, *et seq.*

s.   Defendants have violated Utah Code Ann. §§ 76-10-3101 *et seq.*

t.   Defendants have violated Vt. Stat. Ann. 9, §§ 2453, *et seq.*

u.   Defendants have violated W. Va. Code §§ 47-18-1, *et seq.*

v.   Defendants have violated Wis. Stat. §§ 133.01, *et seq.*

101.   Plaintiff and members of the Class have been injured by reason of Defendants' violations of the above statutes.

## FOURTH CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes

102.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though set forth herein.

103.   As a direct and proximate result of Defendants' unfair and unconscionable conduct, Plaintiff and members of the Class were injured by virtue of Defendants' implementation and enforcement of the JLR No-Export Policy. Defendants engaged in unfair competition, unfair or unconscionable acts or practices in violation of the state consumer protection statutes as alleged herein.

104.   By engaging in the foregoing conduct, Defendants have violated the following state unfair trade practice statutes and/or consumer protection laws:

a.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522, *et seq.*

b.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

c.  Defendants have engaged in unfair competition or unfair acts or practices or made false representations in violation of D.C. Code §§ 28-3901, *et seq.*

d.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*

e.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Iowa Code §§ 714.16, *et seq.*

f.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Idaho Code Ann. §§ 48-601, *et seq.*

g.  Defendants have engaged in unfair competition or unfair acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*

h.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Kan. Stat. Ann. §§ 50-623, *et seq.*

i.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Me. Rev. Stat. tit. 5 §§ 207, *et seq.*

j.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Mass. Gen. Laws ch. 93A, *et seq.*

k.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901, *et seq*.

l.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Minn. Stat. §§ 8.31, *et seq.*

m.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq*.

n.  Defendants have engaged in unfair competition or unfair acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq*.

o.  Defendants have engaged in unfair competition or unfair acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.

p.  Defendants have engaged in unfair competition or unfair or acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq*.

q.  Defendants have engaged in unfair competition or unfair or acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq*.

r.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq*.

s.  Defendants have engaged in unfair competition or unfair acts or practices in violation of N.D. Cent. Code §§ 51-15-01, *et seq*.

t.  Defendants have engaged in unfair competition or unfair acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

u.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq.*

v.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq.*

w.   Defendants have engaged in unfair competition or unfair acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq.*

x.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*

y.   Defendants have engaged in unfair competition or unfair acts or practices in violation of W. Va. Code §§ 46A-6-101, *et seq.*

105.   Plaintiff and the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair or unconscionable acts alleged herein.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**

106.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as though set forth herein.

107.   Defendants have violated the unjust enrichment laws of every state, except Indiana and Ohio.  Defendants have benefited from their unlawful acts by the imposition of the JLR No-Export Policy with respect to their dealings with Plaintiff and members of the Class, thereby causing Plaintiff and the members of the Class to sustain injury to their business and property.  It

would be inequitable for Defendants to be permitted to retain the benefit of increased revenue that they received resulting from the implementation and enforcement of the JLR No-Export Policy.

108.   Plaintiff and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit received by Defendants as a result of the inequitable conduct alleged herein from which Plaintiff and the other Class members may make claims on a pro-rata basis for restitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.   That the Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23;

B.   That the Court determine that the alleged contract, combination or conspiracy among Defendants and their co-conspirators be declared, adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, and enter an order enjoining such conduct in the future under Section 16 of the Clayton Act together with attorneys' fees and costs of suit;

C.   That judgment be entered against Defendants, and in favor of Plaintiff and each member of the Class for the maximum damages permitted under state antitrust and consumer protection laws determined to have been violated by them and for reasonable attorneys' fees and costs of suit;

D.   That judgment be entered against Defendants and against Defendants' successors, assignees, subsidiaries, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, to perpetually enjoin and restrain them from, in any manner, directly or indirectly, continuing,

maintaining, or renewing the aforesaid combination, conspiracy, agreement, understanding, or concert of action, or adopting or following any practice, plan, program, or design, having a similar purpose or effect in restraining competition together with attorneys' fees and costs of suit;

E.     That judgment be entered establishing a constructive trust funded by Defendants' ill-gotten gains, from which Plaintiff and Class members may seek restitution on a pro-rata basis; and

F.     That the Court order such other and further relief as may appear just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b) and otherwise, Plaintiff respectfully demands a trial by jury for all issues so triable.

DATED: June 8, 2017

Respectfully Submitted,

*s/ Peter S. Pearlman*
PETER S. PEARLMAN
COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Peter S. Pearlman
Park 80 Plaza West-One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
201-845-9600
psp@njlawfirm.com

MOTLEY RICE LLC
MICHAEL BUCHMAN, ESQ.
600 Third Avenue
Suite 2101
New York, NY 10016
Tel.:  212-577-0050
Fax:  212-577-0054
mbuchman@motleyrice.com

SINA LAW GROUP
REZA SINA, ESQ.
888 West 6th Street, 11th Floor
Los Angeles, CA 90017
Tel.:  310-957-2057
rez@sinalawgroup.com

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I certify that to the best of my knowledge, the matter in controversy is currently not the subject of any other action pending in this court.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of June, 2017.

*s/ Peter S. Pearlman*
PETER S. PEARLMAN

**CERTIFICATION PURSUANT TO L. CIV. R. 201.1**

Peter S. Pearlman, of full age, certifies that pursuant to L. Civ. R. 201.1 the within matter is not arbitrable, being that the Complaint seeks damages that are in an excess of $150,000.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on this 8th day of June, 2017.

*s/ Peter S. Pearlman*
PETER S. PEARLMAN
